Thank you very much for hearing this appeal and for having me before you again today. I would like to address the court's order from last month by indicating that from the position of Mr. Sand, the response to the inquiries from the court would be no and no. That is, with respect to the question whether he has waived the argument that the administrative law judge had failed to fully and fairly develop the record, our contention would be no, he has not waived that and I would like to explain why on that. And then the first question is whether the ALJ fulfilled his independent duty and the answer to that from the standpoint of Mr. Sand again would be no. To address this, the argument that he put forward in the district court and of course here is that the argument that at the administrative level because of the nature of this case, the remote date last insured, the remote onset that he alleged way back in 1993 on a 2003 application, should have indicated to the administrative law judge in applying Social Security Rule 83-20 the necessity to call upon a medical expert and both sides have cited the SSR 83-20 extensively in the briefing and argued our different positions on that. The reason why I would say that it would invoke under 83-20 the requirement to call upon a medical expert is because as the ALJ's decision says, the record for the time period it issued with his expiration in 1997 for his insurance status, the record of medical evidence at that time was sparse. Later on, more evidence came to light and his representative at the hearing produced a significant amount of medical evidence with respect to his degenerative disc disease because it had begun to take its toll. It's a progressive disease. That's one of the types of circumstances that 83-20 addressed. That is, the different circumstances in which in a Social Security proceeding, an ALJ or an adjudicator, not just an ALJ, should call upon a medical expert with circumstances like this to try to look back and to make inferences. In this case, to infer onset. But the problem that I have with the language of the regulation and the structure of the regulation, it seems to require that or contemplate that there is a finding of current disability, that there's a disability. Then the question is, as you say, if his claim is that this disability traces back to within the coverage period, then you need a medical examiner to go back to see whether what has matured years after the date last insured has its roots and origins before his coverage expired. And in this case, the ALJ said, A, I don't find him to be disabled. And in fact, it goes on and says, I don't find him to have been disabled at any time. And so I'm trying to understand where it is that you are finding a finding of disability or arguing for a disability in this record. The reason I do get richer is this. As I argued in the brief and relying on several cases, the principal one that I think addresses the point that you're raising now is the Armstrong case that I cited. It's from 1998. And the way that I would address you is this, that there is not necessarily the finding first of disability and then in 8320 as invoked. But instead, what we have in our record is a finding by the administrative law judge here at step two, that is, the question, are there severe impairments? The administrative law judge says yes, degenerative disc disease. And so Mr. Sam's position is that that type of finding of severe impairment, degenerative disc disease, and a finding that is itself one having to do with a progressive disease by the nature of it, should then invoke under 8320 the requirement to develop more children in the record. And that's what 8320 talks about so much in a number of different circumstances. It talks about progressive diseases such as DBD. It talks about mental impairments, which also clearly some of them, many of them, are progressive. Some people level off and they don't progress. But some of them get worse and worse. And there are a number of different circumstances and contexts that are discussed in SSR 83-20 that do not necessarily call for that requirement of a finding of disability. And as the Armstrong Court pointed out, it almost undermines 8320 and writes it off the record entirely if there is a requirement first to find disability, then to invoke 8320 because the Armstrong Court says, well, if you have to have an established finding of disability first, then there's no need for 8320. Well, if I look at Armstrong, that sort of underscores my concern. The question in Armstrong was onset date of a disability. There's no finding of disability in this case. There's a finding of non-disability. It's not a question of whether his impairments were severe. The question is, is he, at the time the ALJ has the case before him, provided evidence to show that he is disabled? The ALJ says no. Your argument, well, it's a progressive disease, but progressive disease implies that at some point in this process, it has progressed to the point where he is disabled. There's no such finding. There's an adverse finding on that. So why do you care about an onset date unless you're trying to argue that somehow he had a disability. Its onset was before date last insured. It matured into a disability. Therefore, at some point in the process, he was entitled to some benefits. And now, even though he's gotten better and he's not disabled now, some period of time in there, he was disabled. But I don't, I'm still trying to hear where is it that you're telling us that the ALJ missed the evidence that he was disabled at some point to then try to find out when was the onset. Right. Well, Judge Christopher, what I would say is this, that because he has the obligation to put on some proof that along with the obligation of the agency through the ALJ to fully and fairly develop the record, what he did, the best that he could do, someone like, a claimant like Gary Sand, in this case, is to put on the evidence that he does have, which in this case is post the date of his onset. That's when he saw the necessary medical people to point out that he does have a condition that if the record were fully and fairly developed and a medical expert called in to look at this, might then be able to say onset was prior to March 31st of 1997. Well, let me ask, what specific evidence in the record showed that your client was severely disabled before March 31st, 1997? The evidence, as I read it, you cited only ear pain, fatigue, and alcohol withdrawal as of that time. Is that correct? That's what the medical record showed as of the time when he was insured, yes, Judge Nelson. And what I would point to in response to your question is the submission that I made to the Appeals Council, which is at 535 of your record, and then referring to Exhibit 6F, which is a multi-page thing and it begins at 372. And I'm relying principally on the first and the last page of that. And this would, or at least my argument is that this puts this EDD within the context of his period of insured status. This is a report from the contract position for the agency itself. The first page of that, of Exhibit 6F, is at 372. There, the doctor, whose name is, well I can't quite read, I think it's Dr. Jake Haldwell on the last page. At any rate, he's indicating that he's doing what's called a current evaluation, but he's indicating day-past-insured is 331.97. And the time period when he did this was August 19th of 2003, as you see at 379, which is the last page. There, he has his handwritten comments. And this, Judge Nelson, and actually Judge Fisher as well, I think this would be responsive to your questions. What's the value of trying to have medical, later medical evidence pointing back to years beforehand? And the comment here says, long-standing back pain. And I forget what the symbol means. Since May of 2002, cervical spine MRI showing degenerative disc disease at C4 through 7. Number of sacral x-rays are, and then there's a symbol there, and then he makes a comment about medications. What's the date of that? At 379, the way this doctor does... No, what's the date? 2003. 8-19-03. That's the way that he does those notations there. And what I'm saying is that his use of long-standing points backwards. Does it point to the time when he was insured? We don't know. And I think that at least is enough ambiguity, if we look at the case law that discusses ambiguity, to suggest the need for a medical expert to look at not only what Dr. Caldwell here put, but the entire medical records there to see if all this latter-day medical records could point back to indicate that one prior to March 31st of 1997, Mr. Sand had degenerative disc disease. Was it disabling or was it not? That proves, or could tend to prove on set, which is part of his obligation at Step 2 to put on proof, but it's also part of the obligation on the part of the adjudicator to fully and fairly develop the record. And I hope that I've been more responsive to what you're... All right, thank you. I see my time's up. Time is up. Thank you. May it please the Court, my name is Terry Shea, appearing for the Commissioner of Social Security. Good morning. Good morning. There are two issues that you asked us to address. The first was whether or not the ALJ fulfilled his duty to fully and fairly develop the record, and whether the claimant has waived that issue. We think he's waived the issue. Basically, he didn't bring it up in a way that we thought was reasonable at any time, including before the Ninth Circuit Court of Appeals. The first contact by Mr. Eaglin to the Appeals Council talked about a DDS medical expert who looked at the record that was in existence at that time. He did state the long-standing pain. All the cases that Smolin, for example, Delorme, for another one. In Delorme, there was a lot of evidence already in the record that could have been assessed by the ALJ and by a medical expert, particularly regarding his psychiatric condition. There were notations about psychiatric hospitalizations. There were notations about treatment during the relevant period. And that was what the ALJ needed to develop. In Smolin, the claimant came forward with evidence to fill in the gaps. She brought in lay witness statements. She brought in medical expert testimony. And the ALJ was charged with not properly assessing that evidence. It was really improper rejection. And by improper rejection, they were saying he didn't fully develop the severity of the particular impairment, which I believe was chronic anemia. But they did not say that he needed to go out and get another medical expert. They said he had to look at what he already had. Greger is a different case. It has to do with waiver. But it was startlingly similar to this case in that the ALJ found Hersey credible because he continued to work during the relevant period. Similarly to that, Mr. Sam continued to work during the relevant period. What the agency normally does with these cases, when there is sparse medical evidence, is we get whatever evidence we can from the medical sources. We also ask for lay witness statements. In this case, we asked Mr. Sam to identify lay witnesses. He identified two. The long-standing girlfriend, I think her name was Malcolm, and his sister. But only his girlfriend submitted a statement. In that statement, which she submitted in 2003, there's no indication of depression problems or social withdrawal. She said he was still involved in sports. Basically, that's the kind of evidence that a medical expert, if we brought in yet another one, would have to look at. The medical expert doesn't create new evidence for the claimant. The medical expert looks at the evidence that exists. And what the agency does is make that evidence available in the form of consultative examinations. We sent Mr. Sam for a psychiatric evaluation with Dr. Belka. We sent him for a physical evaluation with Dr. Conant. None of this evidence particularly helped Mr. Sam, even at the point at which it occurred, which was many years past. The fact that he later, you know, there's an issue as to whether or not the arthritis is in fact a degenerative disease or it's something that resulted from trauma in a traffic accident. But there is no evidence in the period during which he regularly sought medical care that he had problems with pain or degenerative arthritis or anything of that nature. So, you know, basically, even if the agency were tasked, say, you should have gotten another medical expert, you should have looked back in time, those are records the medical expert looks at. They don't create e-records. And so the utility of it is very limited. Let me direct you to two reports that concern me in the record. One is dated in December. It's page 396 of 562. It's the December, looks like December 2003, December 19th, 2003, by Blanford, Dr. Blanford. And it says on this medical exam form that the individual, that he's diagnosed with depression. His physical or mental condition is severe enough to prevent him from working full time. And on D, it says potential employers would refuse to hire the individual or provide reasonable accommodation. That's circled yes. And then says, can the individual work? Box, unable to work. And says this is going to last more than 12 months. The, this is followed up, well, this is preceded, I guess, in November by a similar finding by Dr. Elterman, who says, does the individual have any work limitations? Yes. No lifting or, I can't read, part-time disability probably could be feasible. You have two indications in the record that he has a current disability. The November is tagged to, I'm having trouble reading the handwriting, but I think it's the degenerative joint disease in the, I'm sorry, that's 397 of 562. So you have both the joint disease and the depression with two doctor's opinions indicating restrictions on ability to work. Now, just let me, that's foundational. So my concern is that there's a finding by the ALJ that's basically a throwaway, says, you know, he wasn't disabled at any time. I see those, and I say, well, what about those two medical opinions? And if the ALJ was wrong in that respect and there was a disability extent as of 2003, then it seems to me the medical examiner would be, the task would be then to trace back on the available medical records and evidence to find out whether the roots of either or both of those predates the date last uninsured. And we have cases that say, particularly with depression, that it's a very hard to pin down, and that's where a medical expert could be involved. And that's the reason I have a concern about this case. Well, you know, certainly there's, these doctors were working with him, and that period of time he was passed. But that doesn't make any difference. No, I understand what you're saying, but again, if you call them a medical expert, they would be comparing that evidence to the evidence that was available to them. Well, that's right, but they didn't do it. And you have a finding here that he said, that ALJ says he's not disabled, and you have two doctors saying, in effect, yes, he is. ALJ was focusing on the date last insured. Can I just back you up, then? I'm trying to understand what this medical examiner is supposed to do. I don't buy the argument quite as stated by the claimant here, but I do, looking at the regulation in our cases, understand it to say, if there's a finding of disability, but postdates his date last insured, then the issue is tracing, to say, are the roots of this originating at a time when he was insured? And the ALJ may have been focused on whether you needed something beforehand, but the idea of the medical examiner, which is the issue that's being posed in this appeal, is the function of a medical examiner to develop the record is to take a finding of a current disability and see whether or not it occurred or originated before the date last insured. Well, certainly there's an argument that you could do that. It's not an argument. It's a question of law. It's a question of law. It's also a question of utility in this case. Because whatever the medical expert comes up with, based on the date last insured, it can't conflict with the medical evidence that was in evidence at that time. Well, what is it in the evidence that refutes that the degenerative joint disease or the depression didn't trace back before the date last insured? The dates when he did seek treatment, the statements from the doctors he was treated for at the time, there was absolutely no indication of these problems at that time. Plus the statement of his long-term partner in 2003 that didn't talk about depression or degenerative disease, keeping him from doing things like sports. Plus the fact that he also went back to work part-time, which reported a little variously, apparently, or was misunderstood, that he managed this card room. And the fact that he didn't report the income told other doctors he was living on his children's welfare, which could go either way, that he was doing that because he couldn't work or that he was doing it because it was somehow characterological. But the bottom line is, if the agency is required to call on a medical expert, even under 8320, it says in 8320 you look at the evidence that's there. It has to be consistent with the evidence that's there. And the evidence that's there does not support these claims in any way. Thank you. All right. I'll give you a minute for a rebuttal. Thank you. You don't have to use it, I just... Thank you. I won't then. All right. You look startled. I didn't want to put you on the spot. I was thinking about the time and I... Okay. Thank you, Counsel. And the case is submitted. Thank you. And that will bring us to the last case on calendar, which is Alaska Independence Party v. State of Alaska. Thank you. Thank you. Thank you. Thank you.  All right. Thank you. I take it Counsel has no problems with the exhibit? No objection, Your Honor. Thank you. Appropriate to have an election law case on the eve of an election. Puts everything in context. You're right. This won't affect this election though, Your Honor. Well, okay.
judges: Nelson, Tashima, Fisher